IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW KUZNYETSOV, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 10-948 |
| | ) | |
| WEST PENN ALLEGHENY HEALTH SYSTEM, INC. *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

AMBROSE, Senior District Judge

**OPINION AND ORDER OF COURT**

Plaintiffs brought this collective action against their employers, Defendants, pursuant to §216(b) of the Fair Labor Standards Act, 29 U.S.C. §201, et seq. ("FLSA"), for unpaid overtime compensation for work performed during meal breaks. Pending before me is Defendants' Motion to Decertify the Collective Action (ECF No. 107), Plaintiffs' Motion to Certify the Collective Action (ECF No. 109), and Defendants' Motion to Strike the Expert Report of Gerald V. Barrett and Dennis Doverspike (ECF No. 98). For the reasons set forth below, Defendants' Motion to Decertify (ECF No. 107) is granted, Plaintiffs' Motion to Certify (ECF No. 109) is denied, and Defendants' Motion to Strike (ECF No. 98) is denied as moot.

## I. BACKGROUND

Defendants require Plaintiffs to take daily, uncompensated meal breaks. To accomplish this, Defendants adopted a computerized timekeeping system, called Kronos, that automatically deducts a thirty minute meal period from nonexempt employees' time records when an employee has worked a shift of more than five or six hours. If an employee is unable to take an uninterrupted thirty minute meal break, the entire thirty minute automatic deduction may be cancelled so that the employee is paid for the entire meal break. The manner in which the

deduction is cancelled, however, varied by location, department, shift, and supervisor. To cancel the automatic deduction, employees could send an e-mail, fill out a time edit form (each department uses their own specific form), speak with their supervisor, the payroll department, or with a timekeeper. (Docket #9-379 at ECF No. 68-4, ¶17 and Ex. 6). Managers or timekeepers assigned to specific departments had the authority to cancel the deduction. (ECF No. 68-4 Cirell Dec. Ex. 4 at 3 and Ex. 5 at 3) and (ECF No. 68-3, ¶5 and Ex. 2).

Plaintiffs filed a collective action asserting, *inter alia,* willful violations of the FLSA. (Docket #9-379 at ECF No. 324). The case was preliminarily certified under the "fairly lenient" standard on June 1, 2009. (Case No. 9-379 at ECF No. 81).

There are 824 Opt-In Plaintiffs who work in 1,174 different departments at 142 different locations with 312 different supervisors. Originally, the discovery sampling was to include 75 Plaintiffs. (Case No. 9-379 at ECF No. 192). Eventually, only 18 Plaintiffs participated in the sample discovery.[1] Of the 18 Plaintiffs deposed their positions consisted of, *inter alia*: registered nurse, transport associate, senior endoscopy technician, patient access representative, respiratory therapist, utility worker, environmental serviceman, lab specimen process, central supply technician, patient access representative, ultrasound technologist, ultra ethno technician, patient care associate, MRI technician, courier, materials management associate, technician aide, machine operator, surgical technician, unit secretary, and patient attendant. (ECF No. 108-6, pp. 73-74).

Plaintiffs now move to finally certify the collective action. (ECF No. 109). Defendants simultaneously move to decertify the collective action. (ECF No. 107). The motions have been

[1] The 18 Plaintiffs who participated in the sample discovery include: Charles Boal, Pippa Bowey, Rachael Bush, Cheryl Cline, Phillip Conyers, Alexander Fleming, Daniel Gordon, John Hajdukiewicz, Ethel Hayden, Marthann Heilman, Reid Hoyson, Andrew Kuznyetsov, Nancy Marion, Elizabeth Milburn, James Paolino, William Rogers, Daranette Smiley-McKeithen, and Barbara Turner.

fully briefed and are ripe for review.

## II. CERTIFICATION / DECERTIFICATION

### A. Legal Standards

The FLSA mandates employers to pay employees at least the minimum wage for all hours worked. 29 U.S.C. § 201, *et seq*. The FLSA permits employees to maintain a collective action under 29 U.S.C. §216(b) on their own behalf and on behalf of all similarly situated employees. Plaintiffs seek to proceed collectively against Defendants for automatic meal break wage deductions that occurred when work was performed during that time under 29 U.S.C. §216(b). In relevant part, Section 216(b) authorizes collective actions against employers:

> by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). Thus, the two requirements for maintaining a §216(b) class action are that employees are similarly situated and each class member file individual consent to opt-in. *Sperling v. Hoffman La-Roche, Inc.*, 862 F.2d 439, 444 (3d.Cir.1988).

The FLSA does not define the term "similarly situated" and neither the United States Supreme Court nor the Court of Appeals for the Third Circuit provide direct guidance on determining whether potential class members are similarly situated. In the absence of definitive precedent, district courts in the Third Circuit have developed a two-stage test. *Kuznyetsov v. West Penn Allegheny Health Sys.*, No. 09-CV-379, 2009 WL 1515175, at *1 (W.D. Pa. June 1, 2009). During the initial or "notice" stage, the court determines whether a class should be conditionally certified for the purpose of notice to potential opt-in plaintiffs and for pretrial discovery regarding their individual claims. *Id.* (citing cases). In so doing, the court preliminarily determines whether the proposed class consists of similarly situated employees. *Id.* (*citing Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 WL 22701017, at *2 (E.D. Pa. Nov. 13,

2003)). Courts generally examine the pleadings and affidavits of the parties to decide whether the proposed class members are similarly situated, *see Aquilino v. Home Depot, Inc*., No. 04-4100, 2006 WL 2583563 at *1 (D.N.J. Sept. 7, 2006), and utilize a "fairly lenient" standard in rendering such a determination. *Pontius v. Delta Fin. Corp.*, No. 04-1737, 2005 WL 6103189, at *3 (W.D. Pa. June 24, 2005); *see also Kuznyetsov*, 2009 WL 1515175, at *1; _*DeAsencio v. Tyson Foods, Inc*., 130 F. Supp. 2d 660, 663 (E.D. Pa. 2001) (at first tier, plaintiffs have "fairly low burden" to prove similarly situated requirement). If the plaintiff meets the requisite showing, the class is conditionally certified for the purpose of notice and discovery. *Kuznyetsov*, 2009 WL 1515175, at *1. Once the class is conditionally certified, notice is given to the potential plaintiffs so that they may elect whether to opt-in to the action. *Id.*

In the second stage of class certification, after putative class members have filed their consents to opt-in to the collective action and after the court is more fully informed through discovery, the defendant may move to decertify the class on the basis that the "similarly situated" standard has not been met and the court makes its final certification decision. *Sperling*, 862 F.2d at 444; *Kuznyetsov*, 2009 WL 1515175, at *2; *Pontius,* 2005 WL 6103189, at *3. The burden of demonstrating that class members are "similarly situated" is significantly higher at the decertification stage. *See Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000). This stricter standard is used to exam whether the putative members of the action are, in fact, similarly situated. Despite this higher burden, however, similarly situated does not mean "identically" situated. *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sep. 26, 2006) (*citing Moss*, 201 F.R.D. at 409). As all parties agree here, determining whether class members are similarly situated at the decertification stage generally requires consideration of three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant; and (3) fairness and procedural considerations. *See Prise v. Alderwoods Group, Inc.,* No. 06-1641, 2011 U.S. Dist. LEXIS 101817 (W.D. Pa.

Sept. 9, 2011); *Moss*, 201 F.R.D. at 409; *Lusardi v. Xerox Corp.,* 118 F.R.D. 351, 359 (D.N.J. 1987), *mandamus granted in part, appeal dismissed*, 855 F.2d 1062 (3d Cir. 1988), *vacated in part, modified in part*, 122 F.R.D. 463 (D.N.J. 1988), *aff'd in part, appeal dismissed*, 975 F.2d 964 (3d Cir. 1992).

The first factor assesses the opt-in plaintiffs' job duties, geographical location, supervision, and salary. *Moss*, 201 F.R.D. at 409. "The similarities between the named and potential plaintiffs under the first prong 'must extend beyond the mere facts of job duties and pay provisions.'" *Prise v. Alderwoods Group, Inc.,* No. 06-1641, 2011 U.S. Dist. LEXIS 101817, at *56 (W.D. Pa. Sept. 9, 2011) (*quoting Zavala v. Wal-Mart Stores, Inc.,* No. 03-5309, 2010 WL 2652510 , at *3 (D.N.J June 25, 2010).

The second factor concerns whether potential defenses apply to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual opt-in plaintiff. *Id.* at 410. "Individualized defenses prevent efficient representative proceedings and courts have not hesitated to grant decertification on that basis. The court may exercise its discretion to determine whether individual defenses make a collective action unmanageable." *Prise,* at 57 (*citing, Moss,* 201 F.R.D. at 409-410).

The third factor – fairness and procedural considerations – requires me to consider whether I can analyze the potential opt-in class with a "broad scale approach." *Moss,* 201 F.R.D. at 410 *(quoting Lusardi*, 118 F.R.D. at 360). In evaluating this factor, I must consider "that the primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Id.* I also must determine whether I "can coherently manage the class in a manner that will not prejudice any party." *Id.*

While conducting this inquiry, I must refrain from conducting an inquiry into the merits of

the asserted claims. *Prise,* at 58. The focus of this Court's inquiry is whether the proposed Plaintiffs are similarly situated.[2]

At both the first and second stages, the burden is on Plaintiffs to show that other employees are similarly situated. *Id.* (*quoting Bouaphakeo v. Tyson Foods, Inc.,* 564 F. Supp. 2d 870, 891 (N.D. Iowa 2008)). If the conditional group of Plaintiffs does not meet its burden at the second stage, the court will decertify the group, dismiss the opt-in Plaintiffs without prejudice, and permit any remaining Plaintiffs to move with the litigation. *See Lugo v. Farmer's Pride Inc.,* Civ. A. No. 07-0749, 2010 WL 3370809, at *7 (E.D. Pa. Aug. 25, 2010).

On June 1, 2009 I issued an order conditionally certifying Plaintiffs' FLSA claim as a collective action. (ECF No. 81). The present motions to certify and decertify involve a stage two analysis. In conducting this analysis, I have reviewed the numerous pages of exhibits submitted in support of and in opposition to this motion.

**B. <u>Analysis</u>**

**1. Factual and Employment Settings of the Individual Plaintiffs**

The first factor assesses the opt-in plaintiffs' job duties, geographical location,

---

[2] As a result, I will not engage in any discussion regarding the merits of the claim. To that end, I will not address the issue of whether the policy violates the FLSA, but do note that growing consensus of federal courts have recognized that "[s]tanding alone, an employer policy providing automatic deductions for meal breaks does not violate the FLSA." *White v. Baptist Mem. Health Care Corp.,* No. 08-2478, 2011 WL 1883959, *8 (W.D. Tenn May 17, 2011); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.,* 2011 WL 4351631, at 10 (W.D. N.C. Sept. 16, 2011); *Zivali v. AT&T Mobility, LLC,* 784 F.Supp.2d 456, 462-63 (S.D. N.Y. May 12, 2011); *Wolman v. Catholic Health Sys. of Long Island, Inc.,* No. 10-CV-1326, 2011 WL 1741905, *1 (E.D. N.Y. May 5, 2011); *Cason v. Vibra Healthcare,* No. 10-10642, 2011 WL 1659381, * 3 (E.D. Mich. May 3, 2011); and *Frye v. Baptist Mem. Hosp.,* No. 07-2708, 2010 WL 3862591, *5 (W.D. Tenn Sept 27, 2010) ("[The] mere adoption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a unified policy of FLSA violations capable of binding the Plaintiffs together.")). In fact, Plaintiffs here agree that an automatic meal deduction policy is lawful if it creates an accurate record of what the employees actually work. (ECF No. 113, pp. 15-16, *quoting,* Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2007-INA (May 14, 2007) ("[T]he [automatic deduction policy] does not violated the FLSA so long as the employer accurately records actual hours worked, including any work performed during the lunch period.").

supervision, and salary. *Moss*, 201 F.R.D. at 409. In this case there are 824 opt-in Plaintiffs. With regard to only the 18 sample Plaintiffs, it is evident that the job duties among Plaintiffs varied significantly. (ECF No. 108-6, pp. 74-74).

For example, Mr. Boal worked as a registered nurse in the intensive care and telemetry units and scheduled meal breaks as a team leader, while Ms. Bowey transported patients and hospital equipment and collected and transported medical records. (ECF No. 108-6, pp. 73-74). Ms. Bush prepared rooms for procedures, assisted with the procedures, transported patients, broke down and cleaned up rooms and scopes after procedures. *Id.* Ms. Cline registered outpatients and inpatients in the operating or emergency rooms and opened patient files. *Id.* Mr. Conyers put patients on machines to help them with sleep apnea, gave patients treatment, performed blood gasses, transported patients, checked ventilators, took blood, made changes on ventilators and took phone calls. *Id.* Mr. Fleming cleaned the cafeteria and dining area, washed pots and dishes, mopped the kitchen, took food to other floors and loaded trucks with food. *Id.* Mr. Gordon cleaned operating rooms and equipment and performed maintenance work as an environmental serviceman, but as a lab specimen processor Mr. Gordon also received incoming specimens, ordered tests, labeled tubes, ran laboratory reports, answered phone calls and took orders from doctors and nurses. *Id.* Mr. Hajdukiewicz stocked shelves with supplies, transported materials, set up instrument pans, worked in decontamination, made rounds and ensured that pans were sterile. *Id.* Ms. Hayden received phone calls, admitted and processed patients, got forms signed and collected co-payments. *Id.* Ms. Heilman worked as a staff nurse on obstetrics/gynecology and geriatric psychology units, and as a charge nurse, she also assigned work, made rounds, admitted patients, performed secretarial duties, answered visitor questions, notified supervisors of problems, called off nurses or found replacement nurses, ordered medications, communicated with the pharmacy, oriented and trained new nurses, supervised nurses, wrote evaluations and assigned breaks. *Id.* Mr. Hoyson performed

transthoracic, transesophageal and stress echocardiograms. *Id.* Mr. Kuznyetsov worked with cardiac patients to maintain their health, prepared them for surgery, managed their postoperative status and worked with alcoholics going through detoxification. *Id.* Ms. Marion took vital signs, assisted patients, took care of linens and supplies in patients' rooms, assisted in transporting patients for testing, set up monitors, transferred patients to different areas of the hospital and assisted physicians with management and supplies as a patient care associate, while as a registered nurse she worked in the oncology unit. *Id.* Ms. Milburn screened patients, took patients' history, performed physicals, performed thyroid or tumor injections, sent images to radiologist, did paperwork, made requisitions and called in-house patients for their MRIs. *Id.* Mr. Paolino worked as a courier transporting blood, urine and alcohol samples, while as a materials management associate he received orders for equipment, located and transported equipment, operated elevators, filled linen orders, picked up dirty linen and scrubs, loaded machines for the surgery center and operated the Pyxsis system. As a technician aide Mr. Paolino assisted the radiology technician with x-rays and lifting of patients and transported the portable x-ray machines. *Id.* Mr. Rogers filled in for other servicemen when they reported off work and performed general cleaning duties as an environmental serviceman, while he operated the automatic floor machine to scrub floors as a machine operator. Ms. Smiley-McKeithen prepared the operating rooms for surgeries, checked on patients and prepared medications as a registered nurse, and prepared for surgical cases, got instrumentation, set up and maintained a sterile field and assisted doctors as a surgical technician. *Id.* Ms. Turner admitted and discharged patients, scheduled patients for tests and answered the call bell and the telephone as a unit secretary and sat with patients that were confused or suicidal as a patient attendant. *Id.*

Based on the above, a vast range of job duties among the remaining 806 Plaintiffs appears certain. Job duties are highly relevant in terms of how, why and whether the

employees were compensated properly for missed or interrupted meal breaks.

Plaintiffs, nevertheless, argue essentially that the Meal Break Deduction Policy did not vary with respect to location, job duties, or supervisors because the Policy was "'similar, if not common throughout' for all collective action members." (ECF No. 111, pp. 19-23 and ECF No. 113, pp. 26-27). In support of this proposition, Plaintiffs rely on *Andrako v. U.S. Steel Corp.,* 788 F.Supp.2d 372 (W.D. Pa. 2011). *Andrako,* however, is not applicable to this case. In *Andrako,* I had previously found there was a common unlawful policy in violation of the FLSA, which provided a dominant intervening aspect in my evaluation of the "similarly situated" factors that is not present in this case. *Id.* Whether the policy at issue in this case violates the FLSA remains an issue. This is a fundamental distinction that cannot be brushed aside or ignored.[3]

Furthermore, while it is true that there is a Meal Break Deduction Policy and all employees were subject to an automatic deduction that could be cancelled, the application and implementation of the policy was not standard by any means. It differed based on a number of factors, not the least of which was based on the nature of the jobs performed by Plaintiffs, the departments in which the Plaintiffs worked, the supervisors' procedures, and the shifts the Plaintiffs worked. To that end, I must consider the factual and employment settings of the Plaintiffs. Consequently, while Plaintiffs' job duties do not need to be identical, based on above, I find that such substantial diversity in this case does not weigh in favor of certification.

With regard to geographical location, Defendants indicate that the Plaintiffs worked in 142 different locations and 1,174 different departments. (Case No. 9-379 at ECF No. 68-4, ¶3). This is supported by the sample Plaintiffs. (ECF No. 108-6, p. 71). For example, of the 18 sample Plaintiffs, six (6) worked at AGH and those six worked in over 16 different departments. *Id.* Five (5) sample Plaintiffs worked at West Penn Hospital and those five worked in 6 different

[3] The additional district court cases cited by Plaintiffs in their Brief (ECF No. 111, p. 20) are all written by the same judge on the same day and do not persuade me otherwise.

departments. *Id.* Four (4) sample Plaintiffs worked at West Penn Forbes and worked in 7 different departments. *Id.* Three (3) sample Plaintiffs worked at AKMC in 5 different departments. *Id.* To that end, it is evident that often Plaintiffs worked in more than one department. *Id.* With such vast facility and departmental variances, I find this consideration does not weigh in favor of certification.

With regard to supervision, Defendants indicate that there were 312 different supervisors. (ECF No. 108, p. 32, *citing,* ECF No. 108-6, pp. 77-92). Often times Plaintiffs had more than one supervisor depending on the shift they worked or the department where they worked. (ECF No. 108-6, p. 76). For example, of the 18 sample Plaintiffs, fourteen (14) had at least two, and often more than two, different supervisors. It was each supervisor that had the authority to implement the policy. Supervisors would dictate how and when or if meal breaks were scheduled[4] and the method of reporting a missed meal break (a variety of methods were used). (Docket #9-379 at ECF No. 68-4, ¶17 and Ex. 6, Ex. 4 at 3 and Ex. 5 at 3 and ECF No. 68-3, ¶5 and Ex. 2) (*See also,* ECF No. 108, Exhibits M-T). To that end, it is the supervisors who most likely would know if an employee reported a missed meal break. Consequently, this factor exponentially compounds the differences and individualized experiences that go to whether there was a violation of the law, rather than creating consistency. *See, Blaney,* 2001 WL 4351631 at *7-8 (decertifying collective actions because, among other things, defendant established that many alleged common policies were "actually left to the decentralized discretion of the individual units"). Thus, this factor weighs against certification.

Finally, with regard to salary, I do not find this to be a relevant consideration here. While all of the employees were non-exempt, a Plaintiff's salary did not have any bearing on stated

---

[4] For example, some Plaintiffs testified they had scheduled meal breaks while others testified that their meal breaks were not scheduled. *Compare* ECF No. 108-3, p. 15 *with* ECF Nos. 108-4, p. 7; 108-1, pp. 10-11; 1-8-5, p. 4; 108-2, p. 21; 108-3, p. 7; 108-6, p. 26.

policy or its application/implementation. Thus, I find this factor neutral.

Plaintiffs downplay the many relevant dissimilarities discussed above. (ECF No. 113, pp. 26-27). In fact, Plaintiffs claim that these differences are "miscellaneous" because there was just one policy. *Id.* Plaintiffs miss the point. It is the duty of this court to discuss the differences, vast or otherwise, among the factors at this stage. To call them "miscellaneous," and dismiss them in a conclusory fashion, therefore, is inappropriate.

Thus, after full and careful review of the first factor, I find that the differences in Plaintiffs' factual and employment settings weigh heavily against certification.

**2. Defenses Available to the Defendant**

The second factor relevant in determining whether class members are similarly situated at the decertification stage is whether the various defenses available to the defendant appear to be individual to each Plaintiff. Defendants contend that they will need to present significant individualized defenses to determine whether the FLSA requirements were violated such that it cannot be tried on a collective basis. (ECF No. 108, pp. 32-34). I agree. Defendants have produced evidence that the individual supervisors had discretion with regard to whether a meal break was missed and how a meal break deduction would be cancelled. *Id.,* p. 34. By its nature, therefore, it will be a fact-intensive inquiry. *See, Blaney v. Charlotte-Mecklenberg Hosp. Auth.,* 2011 WL 4351631, at 10 (W.D. N.C. Sept. 16, 2011). The defense as to each Plaintiff would require consideration of different facts and individualized testimony that is unique to each Plaintiff and could not be generalized among the 824 Plaintiffs.

For example, it will be necessary to consider whether each Plaintiff had knowledge of the cancellation policy and how to cancel an automatic deduction, whether they worked through a meal break, whether Defendants had knowledge that Plaintiff worked through the meal break, whether the meal break deduction was cancelled, how it was cancelled, whether that Plaintiff was compensated for the time, if not, whether Defendants had knowledge that Plaintiff was not

properly compensated.[5] The knowledge and testimony of each individual manager will be highly relevant and necessary for Defendants' defenses to the allegation. Again, there are 312 different supervisors. The record suggests that their individual knowledge varies because there was no uniform implementation of the cancellation process. Yet, this knowledge is highly relevant to Defendants' defense. Therefore, the defenses available to Defendants for one Plaintiff's claims cannot serve as a proxy for the defenses available with regard to another Plaintiff's claims. Thus, the defenses will be inherently individualized.

The crux of Plaintiffs' argument in response is that Defendants' knowledge of whether they should have known employees were working during meal periods should not be litigated hundreds of times. (ECF No. 113, pp. 27-28). First, I do not find this to be the ultimate question. There is nothing improper under the FLSA of permitting an employee to work during a meal break so long as the employee was properly compensated for that work. Therefore, Plaintiffs' argument misses the point.

Second, I find that the individualized defenses discussed above are highly relevant and will overwhelm the trials. The defenses to which Defendants point are unique to specific Plaintiffs. Trying this case in a collective forum will prevent Defendants from employing these defenses or turn the trial into 824 mini trials. Specifically, during trial, Defendants will be unable to delve into the specifics of an individual Plaintiff's situation, supervisor's behavior, etc. This hardly promotes the efficiency contemplated by collective actions.

Finally, to the extent Plaintiffs rely on *Andrako, supra,* for support of this argument, I find

---

[5]Some Plaintiffs testified that they were paid for all time worked (ECF No. Gordon Exhibit F pp. 9, 31-36 and Bowey Exhibit C pp. 29-31; Hoyson Exhibit I p. 81), while others testified that while they missed a meal break, they were permitted to leave work early (ECF No. Hajdukiewicz Exhibit G, pp. 30 and 35, Heilman Exhibit H p. 54, Milburn, Exhibit L p. 20; Turner, Exhibit N, pp. 22, 28, 29-31). Still other Plaintiffs testified that they did not know if they were not compensated because they could not understand their pay stubs (ECF No. Kuznyetsov, Exhibit J pp. 70-71, 98; Marion, Exhibit K pp. 40, 61, 63-67; 73-74; Boal, Exhibit B, p. 11; Smiley-McKeithen, Exhibit M, pp. 51-52, 108-109)

such reliance to be misplaced. (ECF No. 111, pp. 32-33). To begin with, in *Andrako* I had already found that there was a common unlawful policy when I engaged in the similarly situated analysis. Such is not the case here. The lawfulness of the policy here is still an issue. As a result, Plaintiffs' argument attempting to weigh an unlawful policy against the defenses available to Defendants is not applicable to this case.

Additionally, the defenses in *Andrako* went primarily to damages. In this case, the defenses go primarily to liability. Consequently, *Andrako* is completely distinguishable from this case.

For all of the reasons set forth above, I find collective treatment will leave Defendants unable to employ their various defenses. Thus, I find that this factor weighs heavily against class certification.

**3. Fairness and Procedural Considerations**

The third factor relevant in determining whether class members are similarly situated at the decertification stage is fairness and procedural considerations. The decentralized nature of the application of the manner to cancel an automatic deduction and the independent way that each supervisor implemented the same is contrary to the purposes of collective treatment under the FLSA. Judicial economy is not served in this case by collective treatment.

The disparate factual and employment settings along with the individualized defenses present significant manageability problems. Plaintiffs' counsel provided no workable classification solution and failed to provide representative testimony. I have great reservations that this case could be tried fairly on a broad scale approach based on representative evidence. Inevitably, we would end with over 800 mini trials. Thus, I find collective action in this case is unlikely to promote orderly and sensible case management.

Plaintiffs, however, suggest that fairness and procedural considerations favor certification. (ECF No. 111, pp. 34-36; ECF No. 113, pp. 30-32). In support of this argument,

Plaintiffs cite to *Andrako,* wherein I found that "any perceived management difficulties Defendant raises do not outweigh plaintiffs' interests in collective adjudication" and that the court can resolve any management difficulties when and if they arise. (ECF No. 113, pp. 30-31). As I stated before, this case is completely different from *Andrako*. In *Andrako,* there was a policy *not* to pay employees for the walking time at issue and, thus, there was no issue as to whether the employees were paid as there is in this case. *Id.* at 380-381. Furthermore, all Plaintiffs in *Andrako* worked in a single facility and within only two departments. *Id.* That is not the case here. These facts change the entire complexity of the analysis. Consequently, I find *Andrako* to be completely distinguishable and not analogous to this case at all. Additionally, Plaintiffs offer no meaningful explanation of how this case could be tried in a collective manner. Therefore, I find Plaintiffs' argument to be without merit.

In balancing this final factor, I find proceeding as a collective action is neither fair nor efficient. Consequently, this factor weighs strongly in favor of decertification.

In sum, I find Plaintiffs have failed to show that the Plaintiffs are similarly situated such that it would be possible to generalize across 824 Plaintiffs in this case. The record shows an extremely wide variety of factual and employment settings among the individual Plaintiffs, the supervisors vary with almost each Plaintiff and, thus, the application of the cancelation process for each Plaintiff varied from day to day, from department to department, from facility to facility. As a result, the defenses are inherently individualized. Each Plaintiff's work experiences differed and were thereby affected by the implementation of the policy in different ways. Consequently, it would be inherently unfair to both sides to base one Plaintiff's situation on another's potentially dramatically different situation. Representative evidence simply will not work under these facts. Therefore, the result is a situation such that judicial economy will be hindered rather than promoted by certification. As a result, I find that Plaintiffs have failed to meet their burden to continue this collective treatment, making decertification appropriate.

## III. CONCLUSION

For all of the reasons set forth above, Defendants' Motion to Decertify the Collective Action (ECF No. 107) is granted, Plaintiffs' Motion to Certify the Collective Action (ECF No. 109) is denied, and Defendants' Motion to Strike the Expert Report of Gerald V. Barrett and Dennis Doverspike (ECF No. 98) is denied as moot. [6]

---

[6] Defendants move to strike the expert report of Gerald V. Barrett and Dennis Doverspike. (ECF No. 98). I am denying the motion to strike as moot since Plaintiffs' reliance on the same was made within the arguments that I found to be inappropriate or inapplicable to this case. Consequently, said reports were not considered.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW KUZNYETSOV, *et al.,*<br><br>Plaintiffs,<br><br>vs.<br><br>WEST PENN ALLEGHENY HEALTH SYSTEM, INC. *et al.,*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 10-948 |

AMBROSE, Senior District Judge

**ORDER OF COURT**

And now, this 20th day of December, 2011, it is ordered that Defendants' Motion to Decertify (ECF No. [107]) is granted, Plaintiffs' Motion to Certify (ECF No. [109]) is denied, and Defendants' Motion to Strike (ECF No. [98]) is denied as moot.

A status conference is set for January 3, 2012, at 12:00 p.m. in Courtroom 3B. All counsel shall bring their calendars to the conference for scheduling purposes. The parties should be prepared to discuss settlement.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
Senior U.S. District Judge